**GEORGIA STATE CONFERENCE OF BRANCHES OF NAACP, et al., Plaintiffs,**

v.

**STATE OF GEORGIA, et al., Defendants.**

**No. CV482–233.**

United States District Court, S.D. Georgia, Savannah Division.

Aug. 8, 1983.

---

Patrick W. McKee, Atlanta, Ga., for State.

C.O. Oxford, Americus, Ga., for Americus.

Thomas F. Richardson, Macon, Ga., for Bleckley.

William M. Fulcher, Augusta, Ga., for Burke.

Nathan G. Knight, Newnan, Ga., for Coweta.

James W. Hurt, Cordele, Ga., for Crisp.

Ronald W. Hallman, Claxton, Ga., for Evans.

Franklin J. Edenfield, Swainsboro, Ga., for Jefferson.

G. Stuart Watson, Albany, Ga., for Lee.

Rose Firestein, Savannah, Ga., for NAACP.

Charles Jones, Hinesville, Ga., Ronald H. Rentz, Colquitt, Ga., for Liberty.

Randall Chew, Pelham, Ga., for Pelham.

C. Ronald Barfield, Thomaston, Ga., for Thomaston.

Charles K. Howard, Atlanta, Ga., for Vidalia.

David F. Walbert, Atlanta, Ga., for NAACP plaintiffs.

## ORDER

EDENFIELD, District Judge.

Before the Court are the plaintiffs' and state defendants' cross motions for partial summary judgment. The issue for the Court's determination is this: whether the State of Georgia, the State Superintendent of Schools, and the Members of the Board of Education [hereinafter "state defendants"] are liable for alleged intentional racial and handicap discrimination in the assignment of students to classrooms and programs for the Educable Mentally Retarded (EMR).[1]

Plaintiffs assert that, on the record before the Court, they are entitled to a grant of summary judgment on the issue of the state defendants' liability for permitting the maintenance of racially identifiable classrooms. In addition, the plaintiffs contend that a finding of liability is inescapable on their claim that the state defendants have allowed the misclassification of black students as EMR in violation of feder-

al statutory law. Plaintiffs also submit that summary judgment is appropriate on their assertion that the misclassification of students as EMR is actionable under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794.

The state defendants have vigorously opposed these motions on several grounds. The first defense asserted is, generally stated, that any "racially identifiable" classrooms existing in Georgia public schools are the result of academically sound and constitutionally permissible achievement grouping practices which have been implemented by local school systems. The state also controverts plaintiffs' assertions that this action may be predicated on the theory that the state defendants never fulfilled their obligation to disestablish the unconstitutional dual system, and one consequence of that failure is the current racial malapportionment of classes throughout the State. Further, the State contends that pupil placements are made by the local districts and they cannot be held vicariously liable for the alleged discrimination of these local districts.

If the motion for summary judgment is denied, plaintiffs, in their alternative, have moved that the Court grant their motion *in limine* which avers: (1) that the state defendants are collaterally estopped from attempting to relitigate their liability for the administration of the public schools in Georgia; (2) that the state defendants' responsibility for the administration of the public schools includes the elimination of intentional racial discrimination and separation in the public schools; and (3) that the state defendants' responsibility includes the provision of special education services in accordance with federal and state law. The state defendants deny that the two decisions relied upon by plaintiffs, *United States v. Georgia* and *Georgia Association of Retarded Citizens v. McDaniel,* are dispositive of any issue in this case. Accordingly, the state defendants submit that al-

---

1. In 1982, the terminology changed from EMR to mildly mentally handicapped. However, the term EMR has been used by the parties and the Court throughout this litigation.

lowance of the offensive use of collateral estoppel on these issues is ill-advised.

In reviewing the lengthy arguments of authority submitted on this motion by each party, the Court notes the complete lack of agreement on the proper legal standard to be applied to these claims. As the Court understands the plaintiffs' arguments, this case addresses the problems associated with the "vestiges of discrimination." That is, the suit is premised on the assumption that the perceived ills are the result of the prior *de jure* system, thus present discriminatory intent need not be proved. Liability in many instances would be grounded upon an unfulfilled duty arising from the past. The defendants, both state and local, adamantly argue that for plaintiffs to prevail on those claims asserting a violation of the Equal Protection Clause because of invidious racial discrimination, present discriminatory intent must be proved. It is not clear whether defendants are implicitly contending that evidence of past discrimination is irrelevant to this case.

The Court has reason to pause over this disagreement because each party's arguments, when stripped of counsel's hyperbole, are intrinsically correct. And it can only be accepted as true that since the early 1970's, when massive integration was undertaken in this state, a common goal of society has been the elimination of a pernicious system. The Court has difficulty, however, with the plaintiffs' assumption that the evil currently perceived is automatically attributable to the dual system. Nor does the Court embrace the defendants' assertions that the past *is* the past and therefore this case is one in which present intent to discriminate must be proved. And if this case is properly viewed as a "vestiges" case, then this Court does not desire to make plaintiffs' burden more difficult by application of the defendant's proposed theory. However, there are equally weighty considerations with respect to the state and local defendants' position. The schools have been desegregated since at least the 1970–71 school year. Almost all districts were declared unitary by 1974. There will always be "line drawing" and some is con-

stitutionally permissible. While the imprint of the past segregation cannot be disregarded, the weight accorded it must be placed in perspective.

Against this perspective, the Court views the instant claims as "second generation desegregation problems." They present issues that arise when society has gone beyond eradicating dual facilities. The fairly scant body of caselaw which addresses such issues must grapple with the problem of what was meant, in theoretical terms, by the Supreme Court's directive "to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board*, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968). That is, the question for the Court's determination is what is meant, in 1983, by a unitary system which is to provide equal educational opportunities for all. Finally, the Court must consider the relevance of the Supreme Court's many decisions directed toward the disestablishment of the dual system.

### 1. *The Legal Standard for Proof of Discrimination*

Twenty-nine years ago the Supreme Court was presented with the following question:

> Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other "tangible" factors may be equal, deprive the children of the minority group of equal educational opportunities?

*Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) [hereinafter "Brown I"]. Chief Justice Warren, writing for the Court, answered the question in the affirmative. *Id.* The Chief Justice made some further observations of enduring validity:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recogni-

tion of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

*Id.* at 493, 74 S.Ct. at 691.

In spite of the Court's explicit holding that "segregated schools constituted denial of the equal protection of the laws, *id.* at 495, 74 S.Ct. at 692, and its later admonition to effectuate the administration of public schools on a racially nondiscriminatory basis with "all deliberate speed," *Brown v. Board of Education,* 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) [hereinafter "Brown II"], the period from 1955–1963 was not marked by a flurry of activity directed toward implementation of the court's decree.[2] In 1968, the court was more explicit in its statements, holding that, "School boards ... then operating state compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board,* 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968).

It was not until 1971 that the Supreme Court decided *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) [hereinafter "Swann"]. The task before the Court in *Swann* was the definition "in more pre-cise terms than heretofore the scope of the duty of school authorities and district courts in implementing *Brown I* and the mandate to eliminate dual systems and establish unitary systems at once." *Id.* at 6, 91 S.Ct. at 1271. The Court, before discussing the central issue of student assignment, reviewed its earlier desegregation decisions, specifically *Green, supra.* Like *Swann, Green* involved an existing policy and practice with regard to faculty, staff, transportation, extracurricular activities, and facilities. *Green v. County School Board,* 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968). The Court deemed these factors as the "most important indicia of a segregated system." *Id.* Independent of student assignment where it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown. *Swann, supra,* 402 U.S. at 18, 91 S.Ct. at 1277.

Clearly, the Court's concern at this time was with the elimination of the physical separation of the races in the public schools. The Court specifically declined comment on the other alleged manifestations of intentional racial discrimination stating:

We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with the myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious or ethnic grounds. The target of the cases from *Brown I* to the present was the dual school system. The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school

**2.** Read, *Judicial Evolution of the Law of School Integration Since Brown v. Board of Education,* 39 Law & Contemp. Prob. 7, No. 1 (1975), *reprinted in part in* Barrett, *Constitutional Law: Cases and Materials,* 822–823 (5th ed. 1977).

Professor Read divides the school desegregation cases into three periods: (1) The "Muted Response"—1955–1963; (2) The "Search for Standards"—1963–1967; and (3) "Massive Integration—1968–1972.

authorities. One vehicle can carry only a limited amount of baggage. It would not serve the important objective of *Brown I* to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination. We do not reach in this case the question whether a showing that school segregation is a consequence of other types of state action, without any discriminatory action by the school authorities, is a constitutional violation requiring remedial action by a school desegregation decree. This case does not present that question and we therefore do not decide it.

Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; *it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools.*

*Swann, supra,* at 22–23, 91 S.Ct. at 1279. (Emphasis added).

In 1972, the Court had the opportunity to consider under what limited circumstances the *effect* of a school board's actions would be considered an impermissible one in the effort to dismantle a dual school system. *Wright v. Council of City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972) [hereinafter "Wright"]. In *Wright,* after the school system's desegregation plan was rejected by the district court and another ordered, the City Council of the City of Emporia announced its intention to operate a separate school system beginning in the 1969–1970 school year. Prior to this announcement, the city and the county, pursuant to a contract, had operated a joint school system, albeit segregated, for both city and county residents.[3] After the dis-

trict court enjoined the city from withdrawing its students from the county schools, the schools opened in September under the "pairing" plan ordered earlier by the district court. The Court of Appeals for the Fourth Circuit reversed the district court, and the former was reversed by the Supreme Court, which noted:

Both before and after it became a city, Emporia educated its children in the county schools. Only when it became clear—15 years after our decision in *Brown v. Board of Education,* 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873]—that segregation in the county system was finally to be abolished, did Emporia attempt to take its children out of the county system. *Under these circumstances,* the power of the District Court to enjoin Emporia's withdrawal from that system need not rest upon an independent constitutional violation. *Wright, supra* [407 U.S.] at 459 [92 S.Ct. at 2202].

(Emphasis added).

The Court of Appeals had found that the primary purpose of Emporia's action was "benign," and was not "merely a cover-up" for racial discrimination. Denoting the inquiry into the dominant motivation of school authorities "as irrelevant as it is fruitless," the Court reiterated that the mandate of *Brown II* was to desegregate schools. *Id.* at 462, 92 S.Ct. at 2203. Because the measure of success in the dismantling of dual school systems is the readily ascertainable effectiveness of the plan, a permissible or impermissible motive on the part of school officials is of no consequence. *Id.* It is clear from the opinion of the Court that the "effects-only" test was confined to the situation where actions by school officials would have undermined the elimination of racially identifiable schools.

In *Keyes v. School District No. 1, Denver,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), the Court was confronted for the

---

**3.** The Court noted that "Data submitted to the District Court at its December (1969) hearing showed that the school system in operation under the "pairing" plan, including both Emporia and the county, had a racial composition of 34% white and 66% Negro. If Emporia had established its own system, and if total enrollment had remained the same, the city's schools would have been 48% white and 52% Negro, while the county's schools would have been 28% white and 72% Negro." *Id.* at 464, 92 S.Ct. at 2204.

first time with the problems of desegregation in the North. The Denver, Colorado school system had never been operated under a constitutional or statutory provision that mandated or permitted racial segregation in public education. Instead, the complaint alleged that the school board had intentionally taken certain actions for the purpose of creating or maintaining segregated schools in the district. Justice Brennan's opinion dealt with the questions which arise when the plaintiff proves intentional acts of segregation in one part of a school district and seeks to use them as a basis for obtaining an order desegregating the schools in another part of the district. On this issue, the court held:

Applying these principles in the special context of school desegregation cases, we hold that a finding of intentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions.... We emphasize that the differentiating factor between *de jure* segregation and so-called *de facto* segregation to which we referred in *Swann* is purpose or intent to segregate. Where school authorities have been found to have practiced purposeful segregation in part of a school system, they may be expected to oppose system-wide desegregation, as did the respondents in this case, on the ground that their purposefully segregative actions were isolated and individual events, thus leaving plaintiffs with the burden of proving otherwise. But at that point where an intentionally segregative policy is practiced in a meaningful or significant segment of a school system, as in this case, the school authorities cannot be heard to argue that plaintiffs have proved only "isolated and individual" unlawfully segregated actions.

In that circumstance, it is both fair and reasonable to require that the school authorities bear the burden of showing that their actions as to other segregated schools within the system were not also motivated by segregative intent. *Keyes, supra,* at 208–09, 93 S.Ct. at 2697–98.

The Court also discussed the kind of proof by a school district which might rebut the prima facie case made when the plaintiff establishes intentional acts of segregation plus the existence of segregated schools:

Thus, be it a statutory dual system or an allegedly unitary system where a meaningful portion of the system is found to be intentionally segregated, the existence of subsequent or other segregated schooling within the same system justifies a rule imposing on the school authorities the burden of proving that this segregated schooling is not also the result of intentionally segregative acts.

In discharging that burden, it is not enough, of course, that school authorities rely upon some allegedly logical, racially neutral explanation for their actions. Their burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions. *Keyes, supra,* at 210, 93 S.Ct. at 2698.

During this period, the Court explored the requirements of proof of intentional discrimination in other contexts. In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) [hereinafter "Arlington Heights"]; and *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), the court emphasized that discriminatory purpose or intent as a motivating factor in governmental action was an essential element in the proof of an equal protection violation. The proof offered must go beyond disparate impact. The Eleventh Circuit Court of Appeals recently set forth a cogent recitation of the applicable considerations, which I shall quote at length:

Recognizing that legislative and administrative actions are rarely motivated by one purpose only, the Court held plaintiffs must establish that the challenged decision was at least motivated in part by a discriminatory purpose. *Arlington Heights,* 429 U.S. at 266 [97 S.Ct. at 564]. *See also Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2290, 60 L.Ed.2d 870 (1979). Plaintiffs need not prove a discriminatory purpose was the primary, or dominant purpose, *Arlington Heights,* 429 U.S. at 266 [97 S.Ct. at 564], but must show that the action taken was, at least in part, "because of," and not merely "in spite of" its adverse effects upon an identifiable group, *Feeney, supra,* 442 U.S. at 279 & n. 24 [99 S.Ct. at 2296 & n. 24].

The very nature of legislative and administrative action makes it difficult to ascertain the "intent" of the acting body. For that reason, in *Arlington Heights* the Supreme Court provided some examples of "circumstantial and direct evidence" that courts might properly consider in judging whether invidious discrimination permeated official action. First, there is evidence of "impact," *i.e.* whether the challenged activity "bears more heavily on one race than another," *id.* 429 U.S. at 266 [97 S.Ct. at 564], *citing Washington v. Davis,* 426 U.S. 229, 241 [96 S.Ct. 2040, 2048, 48 L.Ed.2d 597]. In cases where proof of impact alone is insufficient, where a stark pattern of discrimination is not evident, the courts should consider circumstantial evidence, which includes the following factors: (1) historical background of the decision, (2) the specific sequence of events leading up to the challenged decision, (3) departures from the normal procedural sequence, as well as substantive departures, and (4) legislative or administrative history. 429 U.S. at 265–66 [97 S.Ct. at 563–64]. And, because these factors are not exhaustive, *id.* 429 U.S. at 266 [97 S.Ct. at 564], the list has been supplemented: (5) foreseeability of discriminatory impact, *Columbus Board of Education v. Penick,* 443 U.S. 449, 464–65 [99 S.Ct. 2941, 2949–50, 61 L.Ed.2d 666] (1979), (6) knowledge of discriminatory impact, *NAACP v. Lansing Board of Education,* 559 F.2d 1042, 1048 (6th Cir.1977), *cert. denied,* 434 U.S. 997 [98 S.Ct. 635, 54 L.Ed.2d 491] (1979), and (7) the availability of less discriminatory alternatives, *United States v. Board of School Commissioners of Indianapolis,* 573 F.2d 400, 413 (7th Cir.), *cert. denied,* 439 U.S. 824 [99 S.Ct. 93, 58 L.Ed.2d 116] (1978).

Once plaintiffs come forward with evidence sufficient to support a *prima facie* claim the burden shifts to the defendant, the government in this case, "to dispel the inference of intentional discrimination." *Castaneda v. Partida,* 430 U.S. 482, 497 [97 S.Ct. 1272, 1281, 51 L.Ed.2d 498] (1977); *Castaneda v. Pickard,* 648 F.2d 989, 1003–04 (5th Cir.1981). Although the quantum of evidence required from the defendant is unclear from the Supreme Court's decisions it is established that mere protestations of lack of discriminatory intent and affirmations of good faith will not suffice to rebut the prima facie case. *Castaneda,* 430 U.S. at 499 n. 19 [97 S.Ct. at 1282 n. 19]. A defendant must introduce evidence to support its explanations. *Castaneda,* 430 U.S. at 499 n. 19 [97 S.Ct. at 1282 n. 19]. *Jeah v. Nelson,* 711 F.2d 1455, 1486 (11th Cir.1983 (Footnotes omitted)).

The reconciliation and application of these two lines of cases to the instant facts has proved difficult. As generally noted earlier in this Order, the plaintiff position on the issue of the state defendants alleged liability for the maintenance of racially identifiable classrooms is that "in its current posture, the instant case is not one in which plaintiffs are attempting to prove a current discriminatory intent that is independent of the prior *de jure* segregation. Rather, their position is that the state defendants never fulfilled their obligation to disestablish completely the unconstitutional dual system, and one consequence of that failure is the current racial malapportionment of classes throughout the State." On the issue of the state defendants alleged

liability for misclassification of black students plaintiffs assert that the presumption created by *Keyes v. School Dist. No. 1,* 413 U.S. 189, 210, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973) is applicable. Although set forth in full, *supra,* in short the *Keyes* presumption states that where there is intentional racial discrimination in a meaningful portion of the system, "the existence of subsequent or other segregated schooling within the same system" creates a presumption that the discrimination at issue is also the result of intentionally discriminatory acts. Plaintiff theory is that, in the instant case, the intentional racial discrimination which gives rise to the presumption includes the original *de jure* segregation and the subsequent allegedly racially motivated tracking which has been extant since the establishment of biracial schools. Defendants characterize the decisions relied upon by plaintiffs as inapplicable to the instant facts. It is proffered that the holdings of the desegregation cases are limited to the issue *then* before the Court—*i.e.,* what was considered to be permissible and impermissible conduct after the Court's mandate to eliminate the dual system.

It is not even arguable that intentionally segregated schools are anything but *per se* illegal. *Anderson v. Banks,* 520 F.Supp. 472 (S.D.Ga.1981). Defendants assert that the legal distinction to be drawn between the operation of a dual school system in the aftermath of *Brown I* and the present use of achievement tests in schools with a prior history of *de jure* segregation is one of "extreme importance." It is admitted that it takes "little proof" of intent to establish that a state is liable for allowing a local system to maintain separate white and black schools. However, here a heavier burden of proof must be borne by the plaintiffs to show that the allowance of achievement grouping, which results in racially identifiable classrooms, constitutes evidence of intentional discrimination supported by the State.

The parties' primary area of disagreement appears to the Court to focus upon the weight to be afforded *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) [hereinafter *"Brinkman II"*] and *Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) [hereinafter *"Keyes"*].

Of course, the holdings of each case cannot be viewed out of context. Nor does it appear to this Court that either case has been overruled *sub silentio* by subsequent Supreme Court decisions. As described earlier in this Order, *Keyes* involved the trial court's factual finding, made in 1969, that the "School Board had engaged over almost a decade after 1960 in an unconstitutional policy of deliberate racial segregation" with respect to schools in the Park Hill area, which included over 37 per cent of the district's black students, by such devices as "gerrymandering of student attendance zones" and similar acts. *Id.* 413 U.S. at 192, 93 S.Ct. at 2689. In an area adjoining Park Hill, denominated as the "core city" area, there were 22 schools over 70 per cent minority and out of these 22 schools, 11 were over 90 per cent minority. The district court proceeded on the theory that its findings respecting the Park Hill schools were irrelevant because the two areas were "different." *Id.* at 413 U.S. 204, 206, 93 S.Ct. 2695. The district court and the court of appeals both held that a finding of *de jure* segregation as to the core city schools was not permissible since petitioners had failed to prove "(1) a racially discriminatory purpose and (2) a causal relationship between the acts complained of and the racial imbalance admittedly existing in those schools." *Id.* at 207, 93 S.Ct. at 2697. The court continued

This assessment of petitioners' proof was clearly incorrect.

Although petitioners had *already proved* intentional school segregation in the Park Hill schools, this crucial finding was totally ignored when attention turned to the core city schools. *Id.* (emphasis added).

The court then enunciated the familiar *Keyes* presumption which was set forth earlier in this Order. The presumption is triggered when intentional discrimination has

been *proved.* The ease of this proof is dependent upon the facts of each case. The initial question of intent was not presumed in *Keyes,* which is consistent with its citation in both *Washington v. Davis, supra,* 426 U.S. at 240, 96 S.Ct. at 2047 and *City of Mobile v. Bolden,* 446 U.S. 55, 67–68, 100 S.Ct. 1490, 1499–1500, 64 L.Ed.2d 47 (1980). Nor is the Court persuaded that *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) [hereinafter *"Brinkman"*] has been overruled by *City of Mobile, Alabama v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). I addressed this argument in *Anderson v. Banks,* 520 F.Supp. 472, 498–499 (1981). In *Anderson,* two separate racial classification equal protection claims were before the Court. The first claim raised by the plaintiffs was that the "institution and administration of the diploma policy in itself violate[d] the Fourteenth Amendment...." *Id.* at 498. The plaintiffs' second contention was that "the diploma policy constitute[d] a perpetuation of prior *de jure* segregation." *Id.*

It was within the context of the first claim, *i.e.,* the attempt to prove that the diploma requirement was violative of the Fourteenth Amendment independent of Tattnall County's history of *de jure* segregation, that the *Mobile,* decision was summarized as follows:

> Defendants point to the Supreme Court's decision in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), in which an at-large method of electing city officials was challenged as violative of the Fourteenth Amendment. There, in assessing the probative value of evidence demonstrating that Negroes suffered discrimination in jobs at the hands of those who were elected under the at-large system, the Court remarked that such evidence of

discrimination by white officials after they were elected was relevant only as the most "tenuous and circumstantial" evidence of the constitutionality invalidity of the at-large system under which they obtained their offices. Similarly, the Supreme Court noted that the "substantial history of official racial discrimination" in Alabama could not taint present governmental actions in the manner of original sin. Discriminatory purpose must be proved in each instance. *Id.* at 499.

In rejecting defendants' argument that *Mobile v. Bolden* supported the exclusion of all evidence of past discrimination in the case then under advisement, I reasoned that

> In this Court's opinion, *Bolden* does not hold or advise that evidence in such a case must be so severely limited. Instead, it underlies the fact which actually must be demonstrated and warns against basing such an important and well-defined fact as purposeful discrimination on marginally relevant facts from which only weak inferences may be drawn.[4]

*Id.*

In spite of this evidence, I concluded that, aside from the prior history of *de jure* segregation, the diploma requirement did not violate the Fourteenth Amendment.

However, when the diploma requirement was "evaluated in light of the past *de jure* segregation of the Tattnall County School District, I concluded that such a requirement could not be constitutionally imposed on black children who had attended classes in the dual system. *Id.* at 500. The conclusion was inescapable in light of the plaintiffs' presentation of evidence detailing the historical background of the district, the use of tracking in the district, the implementation of the diploma requirement and its racial impact, and specific instances of the effect of these practices on black students

---

4. In 1982, the Supreme Court observed, "Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by courts or made illegal by civil rights legislation, and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo." *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 3280, 73 L.Ed.2d 1012 (1982).

who had attended segregated schools. All of the foregoing was bolstered by plaintiffs' use of statistical evidence.

Moreover, this conclusion was made in light of *Brinkman II.* It was stated that

It is also clear that if present facially neutral actions serve to perpetuate past intentional discrimination, there is no requirement that intent be proved again. That present segregation be substantially caused by past intentional discrimination makes out plaintiff's prima facie case even absent proof of discriminatory intent. *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979); *Debra P. v. Turlington,* 474 F.Supp. 244 (M.D.Fla.1979), *aff'd* 644 F.2d 347 (5th Cir.1981). In the presence of an unsatisfied duty to abolish a dual system, the test is the effectiveness, not the purpose of actions in increasing or decreasing the segregation caused by the dual system. *Brinkman, supra,* 443 U.S. at 538–539, 99 S.Ct. at 2979, 61 L.Ed.2d at 734; *Wright v. Council of City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972).

*Anderson, supra,* at 500. I will stress that the "effects test" was utilized only *after* a finding that "present facially neutral actions serve[d] to perpetuate past intentional discrimination." Such a finding was based upon extensive evidence concerning the history of segregation in Tattnall County. It was not presumed, prior to this factual predicate, that the present situation was *ipso facto,* attributable to the past maintenance of a *de jure* segregated school system.

The methodology employed in *Anderson* for application of the *Brinkman II* formulation was implicitly approved by the Fifth Circuit in *Price v. Denison Independent School Dist.,* 694 F.2d 334 (5th Cir.1982) [hereinafter *"Denison"*]. Although this opinion is not binding precedent on this Court, I consider it to be highly persuasive in that the Fifth Circuit relied heavily upon the law of the former Fifth Circuit in its reasoning and ultimate decision.

In short, *Denison* is a school desegregation case. In 1965, the Denison Independent School District ("DISD") established a freedom of choice plan pursuant to a court order. The plan was effective in the 1965–66 school year. In 1968, the DISD commenced operating only one high school and has continued to do so since that time. In 1969, the DISD voluntarily abandoned the freedom of choice scheme for grade levels below high school in favor of a neighborhood attendance plan. The situation appears to have remained static until the 1979–1980 school year. In the summer of 1979, the DISD promulgated, effective that fall, a new neighborhood attendance scheme which involved the closing of three elementary schools, the conversion of a middle school to an elementary school, and the realignment of new attendance zone boundaries, principally for the elementary schools. On July 31, 1979, shortly after the announcement of this new plan, the initial 1963 desegregation suit was revived, the plaintiffs claiming that the 1979–80 attendance plan continued the vestiges of historical segregation in the DISD. During the 1979–80 school year, the DISD had some 5,200 students, of whom approximately 12 per cent were black. *Denison, supra,* at 336–337. In a series of orders issued in 1980 and 1981, the district court found that the combined differences in the educational conditions and racial composition of the DISD's two junior high schools violated the Equal Protection Clause of the Fourteenth Amendment. A subsequent order concluded that the 1979–80 elementary school student assignment plan left some schools racially identifiable and thus in violation of the Constitution. *Id.* at 338–339.

In a lengthy opinion, the Court of Appeals reversed, among other things, the lower court's finding with regard to the elementary schools because of the method used by the latter to determine whether the racial composition of the elementary schools represented an unconstitutional vestige of *de jure* segregation. *Id.* at 353. The court stated

... [T]he district court's judgment is based on an interrelated two step process.

First, these schools were ultimately determined to be "racially identifiable," as a matter of law, essentially on the sole basis of their former overt *"de jure"* status combined with the deviation of their respective minority percentages from that of the district as a whole by a number of percentage points greater than that allowed by the Foster formula.[5] This finding of "racial identifiability" was basically arrived at purely as a matter of law, as distinguished from being the result of factual conclusions or determinations with reference to the particular conditions and circumstances of these schools and the DISD. Second, it was concluded, as a legal consequence of the presumption arising from the "racially identifiable" status of these schools, that their condition in this respect resulted from intentionally segregative conduct by the educational authorities. Similarly, this determination was in essence a legal one, and did not rest on an articulated consideration of the particular facts and circumstances of these schools and the DISD or on a drawing of factual inferences or conclusions therefrom.[6]

*Id.* at 353. (Footnotes not in original).

While *Denison* is readily distinguishable on its facts from the case at bar, *i.e.*, the allegations in the former centered upon the racial composition of certain schools and the district's black students comprised only 12% of the total, the proposed framework for analysis should be used here. The Court noted that inquiry must be made into whether the "current racial composition of the schools [results] from past or present intentionally segregative action by the educational authorities." *Id.* at 351. The Court must make an assessment of the actions of school authorities and "[o]bviously, such action includes that which is covertly, as well as avowedly, for a segregative purpose." *Id.* And though many elements of possible proof were mentioned in the opinion, as well as in this Court's opinion in *Anderson v. Banks,* a finite list of factors essential to proof of discriminatory intent is not forthcoming from this Court or any court grappling with the problems of a second-generation desegregation case.[7] Statiscal and historical proof are quite relevant in cases such as these in which a factual inference must be drawn to support the ultimate legal conclusion. It is only through such a progression that the current condition of the entity can be assessed. *See Rogers v. Lodge,* —— U.S. ——, ——, 102 S.Ct. 3272, 3276, 73 L.Ed. 1012, 1018 (1982) (Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another).

5. The reference is to the testimony of a Dr. Gordon Foster, a statistical expert in *Columbus Board of Education v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). At the trial level in *Penick,* Dr. Foster used a statistical index in terming a school as "racially identifiable." *Penick v. Columbus Board of Education,* 429 F.Supp. 229, 264 (E.D.Ohio, 1977), *aff'd* 583 F.2d 787 (6th Cir.1978).

6. As an aside, the Court of Appeals quoted the following colloquy from the trial record of the District Court.

THE COURT: All right, It's my sense that we're wasting a lot of time in this case talking about intent. The Supreme Court held in *Dayton Board of Education against Brinkman* in 1978 at 443 U.S. 526 [99 S.Ct. 2971, 61 L.Ed.2d 720]—the decision came down July 2, 1979—says, "The measure of the post Brown I conduct of a school board under an unsatisfied duty to liquidate a school system is the effectiveness, not the purpose, of the

actions in decreasing or increasing the segregation caused by the school system."

"So we don't have here a question of intent; we've got a question of effectiveness, so I suggest that all of this testimony about intent is totally irrelevant, so let's go forward with the evidence that is relevant."

*Id.* at 352. The appellate court remarked that this statement reflected the district court's view that there was "no issue for further evidentiary development, or for factual determination, as to whether the current racial compositions of the schools resulted from past illegal segregation by the educational authorities." *Id.*

7. *See Green v. County School Board of New Kent Co., Va.,* 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968) (In order to achieve a unitary status after maintenance of a dual system, a school must be fully integrated in six areas: faculty, staff, student bodies, facilities, extracurricular activities, and transportation).

Defendants have asserted that *Denison* undercuts the plaintiffs' position in their motion for summary judgment and supports that of the defendants. This assertion is simply not true. *Denison* represents an accommodation of the two positions. This fact is evident from the Court's condensation of the controlling propositions of law from the main case.

Contrary to the suggestion of the appellees, we did not and do not hold that in a former *de jure* school system, proof and finding of discriminatory intent on the part of the educational authorities is necessarily required to establish an existing constitutional violation. When a trial court has duly found, after proper consideration of all the relevant factors, that some current condition of racial segregation or inequality exists within a school system, it will then be determined whether the existence of such condition amounts to a constitutional violation. Where the referenced current condition results from the prior *de jure* segregation in the school system, a present constitutional violation is established without proof or finding that the former *de jure* segregation was intentional, for it is so as a matter of law, and the fact that the school authorities may more recently have been in good faith and had no segregative or discriminatory intent is not dispositive of whether an existing constitutional violation is present. On the other hand where the referenced current condition does not result from the prior *de jure* segregation, proof and finding of subsequent discriminatory intent on the part of the educational authorities is necessary to establish a present constitutional violation.

*Price v. Denison Independent School Dist., supra,* at 378 (response to the Suggestion for Rehearing En Banc).

■ After a thorough review of the complete record in this case, with due consideration given to the arguments set forth in the lengthy briefs submitted by counsel, the Court cannot take the "great leap of faith" and declare the issue to be one which is ripe for summary judgment. The plaintiffs

have demonstrated a statistical overrepresentation of black students in lower level classrooms and in EMR programs. The Court is not willing to presume that the "referenced current condition" results from prior *de jure* segregation in the school system. None of the students in the certified class has attended a school segregated by law, unlike the prevailing plaintiffs in *Anderson v. Banks*. The school systems have been unitary for at least a decade and, in some instances, longer. However, the Court remains cognizant of the fact that "... discriminatory student assignment policies can themselves manifest and breed other inequalities built into a dual system founded on racial discrimination. Federal courts need not, and cannot, close their eyes to inequalities, shown by the record, which flow from a longstanding segregated system." *Milliken v. Bradley*, 433 U.S. 267, 283, 97 S.Ct. 2749, 2759, 53 L.Ed.2d 745 (1977).

The cases on which plaintiffs rely had the "benefit" of temporal proximity to a "social evil of such horrible magnitude", the dual system. *See Anderson v. Banks, supra,* at 502. Proof of constitutionally impermissible conduct predicated on the past necessarily becomes more difficult as the causal link becomes more attenuated. See *Debra P. v. Turlington*, 564 F.Supp. 177 at 187–88 (D.Fla.1983).

Accordingly, plaintiffs' and state defendants' cross motions for summary judgment on the aforementioned claims are denied. It is anticipated that the parties will use the preceding discussion in formulating the presentation of their cases for trial.

### 2. The Motion In Limine

Plaintiffs seek to invoke the doctrine of collateral estoppel by asserting that the state is barred from relitigating its authority and obligation to insure that the local education boards have completely eliminated all vestiges of the dual systems and have refrained from adopting practices that will cause racial separation. Defendants argue that *U.S. v. Georgia*, Civil No. 12972

(N.D.Ga. Dec. 15 and 17, 1969) (3-judge court), stands for the sole proposition that the State of Georgia cannot maintain a dual public school system with separate facilities for black and white students. Defendants further submit that nothing in *U.S. v. Georgia* supports the determination sought by the instant plaintiffs that the state defendants are strictly liable for, and must affirmatively correct, any alleged constitutionally impermissible activities by the local school boards.

██ It is well-settled that preclusive effect will be given to the adjudication of an issue litigated in a prior proceeding if the issue in the subsequent proceeding is identical to the one involved in the prior action, the issue was actually litigated, and the determination of the issue was necessary in the prior action. *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir.1982). In the case at bar, the plaintiffs seek to estop the defendants from relitigating issues purportedly litigated and lost in the *U.S. v. Georgia* action, thus invoking the offensive use of collateral estoppel. The Supreme Court has granted the district courts broad discretion in permitting the offensive use of collateral estoppel with the proviso that the exercise of this discretion is governed by considerations of fairness to the defendant in foreclosing relitigation of an issue. *Williams v. Bennett, supra,* at 1382, *citing Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331–332, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979). That is, where there is a significant likelihood of substantial unfairness, application of offensive collateral estoppel constitutes an abuse of discretion. *Deweese v. Town of Palm Beach,* 688 F.2d 731, 734 (11th Cir.1982). Moreover, it has been noted that the courts should avoid a rule that would force defendants to take a frivolous appeal simply to avoid the issue preclusive effect of certain alternative grounds. *See Hicks v. Quaker Oats Co.,* 662 F.2d 1158, 1169 (5th Cir.1981). Thus, the Supreme Court has cautioned against application of offensive collateral estoppel in a manner that would result in increased litigation. *Parklane Hosiery Co., supra,* 439 U.S. at 329–330, 99 S.Ct. at 650–51. A trial

judge may justifiably refuse to allow offensive use of collateral estoppel if the defendant did not have either an incentive to litigate the issue vigorously or a full and fair opportunity to litigate it in the prior proceeding. *Parklane Hosiery Co., supra,* at 332, 99 S.Ct. at 652. *See also In re Cenco Inc. Sec. Litig.,* 529 F.Supp. 411, 416 (N.D. Ill.1982) (refusing to give offensive collateral estoppel effect to a consent decree because application of the doctrine would diminish the incentive to avoid litigation through consent decrees). Finally, a court should also consider whether controlling facts or legal principles have changed significantly since the prior action and whether other special circumstances warrant an exception to the normal rules of preclusion. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

██ The record demonstrates that on December 15, 1969, a three-judge court ruled on the state defendants' Rule 12(b)(6) motion to dismiss in *U.S. v. Georgia,* No. 12972. ("State defendants" included the State of Georgia; the members of the State Board of Education, individually and in their official capacity; and the State Superintendent of Schools, individually and in his official capacity. The same entities are involved in the case at bar). In denying the defendants' motion, the court stated:

If, as we must assume on this motion to dismiss, the defendants possess the supervisory powers over the public schools of Georgia, alleged in the complaint, and the defendants have either directly supported through deed or indirectly maintained through inaction, the dual school system, the relief sought can be obtained. Moreover, in Georgia, the State Constitution itself makes education a statewide function. *See* Art. VIII, § 2.6401 of the Georgia Constitution [currently Art. 8, § 1, ¶ 1]. The State Constitution and statutes impose broad power on the State, the State Board of Education, and the State Superintendent, to regulate the operation of the state-wide public school system. *See* Art. VIII, § 2–6501 of the

Georgia Constitution; Georgia Code §§ 32–603, 32–606, 32–624, 32–618, 32–910.

*U.S. v. Georgia,* Dec. 15, 1969, *supra,* at 3.

In its Order of December 17, 1969, the Court concluded that because the state school board and state superintendent's office were vested with vast powers to inspect, to standardize, to recommend, and, moreover, to check the reliability of reported figures of each district, these bodies were best suited to monitor the progress in desegregating the schools. In furtherance of this goal, the State Board of Education was ordered to obtain compliance plans from the local schools involved and to review those plans with the assistance of the Atlanta Regional Office of the Division of Equal Educational Opportunities of the Office of Education (then the U.S. Department of Health, Education, and Welfare). The State Board was required to specifically state whether the plan of each school district complied with the standards established by the Court. Where any plan did not comply with the standards, the State Board was further directed to endeavor to secure compliance. The State was ordered to withhold funds from any local school district which did not submit a plan or whose plan was found not to be in compliance by the State Board or was found by the Court not to have been implemented.

Defendants assert that the foregoing precludes this Court from applying *U.S. v. Georgia* as collateral estoppel on the issue of the state's responsibility for any illegal *grouping practices* used in public schools. The State defendants submit that they were only required to evaluate desegregation plans and attempt to obtain compliance from local districts whose plans did not meet the mandated criteria.

Countering this argument, the plaintiffs point to the following language in the permanent injunction issued against the State defendants in *U.S. v. Georgia* in 1973 and 1974:

The State of Georgia; the State Board of Education, its individual members and the State Superintendent of Schools (a) shall not take any action which may result in the reestablishment of the former dual school system in any of said school districts; (b) shall not permit any action by any of said school districts which would violate the terms of the permanent injunction provided for in paragraph 4 of this order; (c) shall not provide any state funds to any of said school districts which has been found in violation of the terms of the permanent injunction provided for in paragraph 4 of this order; and (d) shall make appropriate inquiries whenever the State Department of Education receives information or complaints reflecting possible violation by any of said school districts of the terms of the permanent injunction provided for in paragraph 4 of this order.

*U.S. v. Georgia,* Civil Action No. 12972 (N.D.Ga. June 23, 1973); Civil Action No. 2771 (M.D.Ga. Jan. 24, 1974); Civil Action No. 3009 (S.D.Ga. Feb. 14, 1974). The regulatory injunction of December 17, 1969 was dissolved and the preceding language was made applicable to the state defendants and the school districts placed on the inactive docket of the Court, *i.e.,* the school districts then in compliance. The referenced paragraph 4, *supra,* by its terms was made applicable to both the state defendants and the school districts, stating:

(a) The school district shall take no action which tends to segregate students or faculty *by or within* schools on the basis of race, color or national origin.

*U.S. v. Georgia,* Civil Action Nos. 12972, 2771, and 3009, *supra.* (Emphasis added). As is evident, these orders explicitly imposed responsibility upon the state for insuring that the local districts did not reestablish the dual system in any fashion. The terms of this permanent injunction are still effective. At least, amidst the massive record developed in this action to date, there is no indication that a motion for modification has been made.[8]

8. Normally, the proper method for requesting    modification of an existing injunction is to file

Defendants are correct in asserting that the foregoing desegregation orders do not make them strictly liable for *any* alleged unlawful activities by local schools. However, the very language of the permanent injunction does impose upon these defendants, and those in privity with them, a continuing duty to guard against the reestablishment of a dual school system "by or within schools." If the Court determines that the complained-of actions in this case are indeed the result of a "resegregation" effort, then the State defendants may well be in violation of the terms of the permanent injunction. If this scenario proves to be the case, then the State defendants will not be heard to say that they had neither the authority nor the obligation to end such practices. On the other hand, a more difficult question arises if plaintiffs are unable to prove that the current practices are related to the prior *de jure* system.

From the authority set forth, *supra,* I do not perceive an unfairness in precluding the defendants' relitigation of the issue of its authority and obligation to insure that the local education agencies have completely eliminated all vestiges of the dual system and have not adopted practices that will cause racial separation. This conclusion will *not* allow plaintiffs to use collateral estoppel as a basis for finding that the state has engaged in intentional racial discrimination.

Reiterating the prerequisites to the application of the doctrine:

1) that the issue at stake be identical to the one involved in the prior litigation;

2) that the issue has been actually litigated in the prior litigation; and

3) that the determination of the issue in the prior litigation has been a critical

and necessary part of the judgment in the earlier action.

*Deweese v. Town of Palm Beach,* 688 F.2d 731, 733 (11th Cir.1982), it is clear that all three prerequisites are met on the issue of the state's authority and obligation to end segregation "by and within" Georgia's schools.

In *Georgia Association of Retarded Citizens v. McDaniel,* 511 F.Supp. 1263 (N.D.Ga. 1981) [hereinafter "GARC"], the court was presented with the issue of whether a profoundly mentally retarded child, and other members of the class he represents are entitled to be considered for or to receive more than 180 days of free public education in order for the state appropriately to meet its obligations under applicable federal and state statutes. *Id.* at 1267. Two of the three sub-issues addressed by the Court were (1) whether the local and state defendants, or either of them, maintain a policy or practice of failing to consider or provide for the needs of mentally retarded children for education in excess of 180 days per school year; and (2) whether, if the policy or practice is found to exist, it violates applicable federal or state statutes. The Court also considered whether the Education for All Handicapped Children Act (Handicapped Act), 20 U.S.C. § 1401 *et seq.,* and Section 504 of the Rehabilitation Act of 1973 (Section 504), as amended, 29 U.S.C. § 794, could both be applied in the action. *Id.*

The Handicapped Act is a funding statute designed to assist states in furnishing educational services to handicapped children. The receipt of this federal money is contingent upon the state's performing certain *affirmative duties* with respect to the education of the handicapped. *N.M. Ass'n. for Retarded Citizens v. State of N.M.,* 678 F.2d 847, 853 (10th Cir.1982) (emphasis in original). In contrast, Section 504 of the Reha-

---

in the trial court a Rule 60(b)(5) motion which asserts that "it is no longer equitable that the judgment should have prospective application." *See Daubert v. Schmidt,* 498 F.Supp. 1344 (E.D. Wisc.1980). In *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), the court was confronted with the refusal of a district court to modify its earlier injunction. The terms of the injunction

were inconsistent with the intervening ruling in *Swann v. Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) and were also ambiguous. Because of these two factors, the court held it was an abuse of discretion for the district court *not* to modify its earlier injunction. *See also* Wright & Miller, *Federal Practice and Procedure:* § 2961 at 604–605 (1973).

bilitation Act of 1973 constitutes an across-the-board requirement of non-discrimination in all federally assisted programs, including handicapped services offered by elementary and secondary public schools. *See* 34 C.F.R. § 104.33 *et seq.* (1982).

In *GARC,* the court held that the policies of the State Superintendent of Schools and the State Board of Education "that prohibit the provision of schooling for mentally retarded children in excess of 180 days violate both the [Handicapped Act] and [Section 504]. These policies prevent handicapped children from receiving the individualized attention to their needs that is mandated by both statutes." *GARC, supra,* at 1285. Contrary to defendants' assertions in the case at bar, the court had earlier held that "... Section 504 ... requires a recognition of the individual needs of all handicapped children by educational programs or systems which receives federal funds. Because the defendants' 180-day policy prohibits the individual consideration of children's needs, it violates Section 504." *Id.* at 1281. Clearly, Section 504 and its implementing regulations impose a duty upon the recipient of federal funds for educational purposes.

■ Moreover, in this Court's last encounter with Section 504, it was determined that Section 504 and the regulations promulgated thereunder had been violated through Tattnall County's misclassification of school children as mentally retarded. *Anderson v. Banks, supra,* at 511–512. Plaintiffs have stated a viable cause of action under this section, independent of the Handicapped Act.

■ However, returning to this Circuit's test for the application of the doctrine of offensive collateral estoppel, last set forth at p. 329, *supra,* I find that the necessary prerequisites have not been met in this instance. The issue at stake in *GARC* involved the state policy on the provision of educational services to those students validly classified as EMR. The testimony of State Department of Education Officials set forth in the footnotes of Judge Ward's opinion demonstrates that this was the narrow issue on which the state defended. Although Judge Ward rejected the defendants' assertions of non-responsibility for local boards' provision of additional instruction time for those eligible, the Court's conclusion was limited to the 180-day policy.

Collapsing the second and third requirements, it appears that the issue presently before the Court—the state's responsibility for the alleged misclassification of black students as mentally retarded—was neither actually litigated in *GARC* nor was the issue a necessary part of the judgment. The class members in *GARC* were all apparently properly classified. While from the record it does appear that the State defendants are actively involved in the administration of Georgia's special education programs, there also appears to be a myriad of such programs. The State defendants' responsibility on these programs is more properly adjudicated on a case by case basis. To estop the State defendants in the instant action from defending on the merits on the basis of prior adjudications where the issues were narrowly drawn, would result in "substantial unfairness" to these defendants. Accordingly, plaintiffs' motion *in limine* based upon *Georgia Ass'n. of Retarded Citizens v. McDaniel* is hereby denied.

*Conclusion*

The parties should not construe the foregoing as a directive from the Court to embark upon new avenues of discovery in preparation for trial. This Order is not intended to be a comment upon or judgment of the relative strengths or weaknesses of any party's case as reflected in the record currently before the Court. Rather, as stated earlier, the preceding was intended to serve as a guide for the parties in organizing their evidence for presentation at trial.

Moreover, this Order renders moot, plaintiffs' motion to strike portions of defendants' affidavits (offered in support of defendants' motion for summary judgment). The Court will hold in abeyance plaintiffs' motion for partial summary judgment or in

the alternative, *in limine:* II. Plaintiffs may renew the latter motion at a later date, if necessary.

It is hereby ordered and adjudged that both plaintiffs' and State defendants' cross motions for summary judgment are hereby denied. Plaintiffs' motion *in limine* based on the prior adjudication in *U.S. v. Georgia* is held in abeyance, as discussed, *supra.* Plaintiffs' motion *in limine* predicated upon *Georgia Ass'n. of Retarded Citizens v. McDaniel* is hereby denied.

SO ORDERED.