**NEW MEXICO ASSOCIATION FOR RETARDED CITIZENS, et al., Plaintiffs-Appellees,**

v.

**The STATE OF NEW MEXICO, et al., Defendants-Appellants.**

No. 80–1876.

United States Court of Appeals, Tenth Circuit.

May 13, 1982.

Rehearing Denied June 14, 1982.

---

John F. Kennedy, Asst. Atty. Gen., and Robert N. Hilgendorf, Sp. Asst. Atty. Gen., Santa Fe, N. M. (Jeff Bingaman, Atty. Gen., Santa Fe, N. M., with them on the brief), for defendants-appellants.

Marian Matthews of Matthews & Crider, P. C., Albuquerque, N. M. (Anson B. Levitan of Northern N. M. Legal Services, Inc., Santa Fe, N. M., with her on the brief), for plaintiffs-appellees.

C. Emery Cuddy, Jr. of White, Koch, Kelly & McCarthy, P. A., Santa Fe, N. M., filed an amicus curiae brief for New Mexico School Boards Assn.

Marianne Bennett, Albuquerque, N. M., filed an amicus curiae brief for Protection and Advocacy System for New Mexicans with Developmental Disabilities, Inc.

Before BARRETT and SEYMOUR, Circuit Judges, and BROWN,* Senior District Judge.

* Honorable Wesley E. Brown, Senior District Judge for the District of Kansas.

1. Other named plaintiff associations in this lawsuit are the New Mexico Federation of Council for Exceptional Children, the New Mexico Association for Children with Learning Disabilities, and the New Mexico Mental Health Association.

SEYMOUR, Circuit Judge.

This appeal necessitates a review of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504). At issue is the scope of pre-college education rights afforded handicapped children under this statute and its compliance regulations. Our analysis of the question prompts reversal of the trial court decision and remand of this case for additional proceedings.

I.

*Background*

In October 1975, the New Mexico Association for Retarded Citizens and others[1] (Association) commenced a class action against the State of New Mexico and certain of its governing officers and bodies[2] (State). The Association sought declaratory and injunctive relief on behalf of elementary and secondary school-age handicapped children allegedly denied certain federally guaranteed special education services.

The Association's original complaint was framed in eleven separate counts. Four of the counts raised constitutional issues, five of the counts posited pendant state law claims, and two of the counts charged violations of federal statutes. A three-judge district court dismissed the five state law claims for lack of jurisdiction and severed the four constitutional claims pending resolution of the federal statutory causes of action. One of the two remaining claims alleging violation of a federal statute was dismissed with prejudice by the court below and is not before us. In the only cause of action which survived trial, the Association asserts that the State's treatment of handi-

2. Other named defendants in this action include the New Mexico State Board of Education, the New Mexico Department of Education, the various individual members of those organizations, the Albuquerque Public School District, and members of the Albuquerque Board of Education. The Albuquerque defendants did not appeal.

capped students in its school system violates Section 504.

Following a bench trial, the district court concluded that the State violates Section 504 by discriminating against handicapped children when providing educational services. The court found that: (1) occupational, physical, and speech therapies offered by the State are deficient; (2) handicapped diagnostic services provided by the State are insufficient; and (3) special education programs are inadequately funded by the State. 495 F.Supp. 391. The district court directed the State to submit a plan for compliance with the statute's regulations and permitted the Association to do likewise.[3] The State's plan was rejected as not sufficiently responsive to the regulations, and the trial court ultimately adopted the Association's plan after the State declined to submit a modified compliance proposal.

The State appeals the decision of the district court primarily on three grounds: (1) that the doctrines of exhaustion of administrative remedies and primary jurisdiction bar the Association's lawsuit; (2) that the district court incorrectly found the State in violation of Section 504; and (3) that the trial judge exceeded his authority by fashioning an overly broad remedy.

## II.

### Exhausted Remedies and Primary Jurisdiction

The State vociferously argues that the doctrines of exhaustion of remedies and primary jurisdiction bar this lawsuit. It claims the Association's Section 504 action is fatally premature because the class did not exhaust its administrative remedies by initially submitting at least one claim in federally-authorized state agency proceedings. It also contends the district court should have invoked the doctrine of primary jurisdiction and permitted the Office of Civil Rights (OCR) to first complete its investigation into the charges.

Exhaustion of remedies and primary jurisdiction are closely connected doctrines. Both principles promote proper relationships between courts and administrative bodies through a policy of suspending judicial consideration pending agency action. *See United States v. Western Pacific Railroad*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–165, 1 L.Ed.2d 126 (1956). Exhaustion requires agency determination of claims initially cognizable exclusively at the administrative level prior to court intervention. *See United States v. Radio Corp.*, 358 U.S. 334, 346 n.14, 79 S.Ct. 457, 464 n.14, 3 L.Ed.2d 354 (1959). Primary jurisdiction mandates similar judicial restraint: disputes properly pressed in either the courts or administrative bodies are to be first decided by an agency specifically equipped with expertise to resolve the regulatory issues raised. *Id.*

The exhaustion principle is not indiscriminately applied to block judicial action in every circumstance where a litigant has failed to explore his administrative avenues of relief. *See Martinez v. Richardson*, 472 F.2d 1121, 1125 (10th Cir. 1973). "[I]mprobability of obtaining adequate relief by pursuing administrative remedies is often a reason for dispensing with the exhaustion requirement." 3 K. Davis, *Administrative Law* § 20.07 at 97 (1958) (Davis). *See Pushkin v. University of Colorado*, 658 F.2d 1372, 1380–82 (10th Cir. 1981); *Martinez*, 472 F.2d at 1125. Also, a party need not procure administrative review of its claim if resulting time delays would subject substantive rights to irreparable harm. *Martinez*, 472 F.2d at 1125 & n.10; *see Cannon v. University of Chicago*, 441 U.S. 677, 706 n.41, 99 S.Ct. 1946, 1962 n.41, 60 L.Ed.2d 560 (1979). Such limitations on exhaustion have been employed in Section 504 litigation. *See, e.g., Pushkin*, 658 F.2d at 1380–82; *Kling v. Los Angeles*, 633 F.2d 876, 879 (9th Cir. 1980); *Camenisch v. University of Texas*, 616 F.2d 127, 133–35 (5th Cir. 1980) *vacated on other grounds*, 451

---

**3.** The State and another named defendant, Albuquerque Public Schools, were ordered to prepare compliance plans. The Association, upon its request, was allowed to formulate a suggested compliance program of its own design.

U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d (1981); *Sherry v. Education Department,* 479 F.Supp. 1328, 1334 (W.D.N.Y.1979).

█ A review of the federally-authorized state administrative remedy at issue here reveals that it is directed toward resolving disputes over the "identification, evaluation and placement" of handicapped students within the State's existing special education system.[4] Rec., vol. XXIII, ex. NM–A, § 3.4 *et seq.* This procedure empowers the hearing authority to find State placements and identifications appropriate or inappropriate, and to suggest alternative programming within the State system in the latter instance. There is no provision in the State scheme for class claims to be presented before the hearing authority.

The State administrative process provided in this case poses both quality of relief and time lapse problems to the class. The gravamen of the Association's lawsuit is that the entire special education service system offered by the State is infirm. The remedies offered at the administrative level—primarily reassignment of students within existing programs—do not include a restructuring of the State's system to comply with Section 504 as sought by the class in this case. Exigent time factors involved in this action further underscore the inadequacy of the State's individualized proceedings for purposes of curing alleged system-wide defects. *See Cannon,* 441 U.S. at 707 n.41, 99 S.Ct. at 1963 n.41. Six school years have already been irretrievably lost while this litigation has run its course. To subject this sizeable class of handicapped children to further delay in obtaining adequate services would jeopardize its receipt of appropriate education at the precollege level. Accordingly, we hold that the Association is not required to exhaust its state administrative remedy.

█ Neither is the court below required to invoke the doctrine of primary jurisdiction and await the outcome of OCR's investigation before proceeding in this action. "The principal criterion in deciding whether the doctrine is applicable ... usually is judicial appraisal of need or lack of need for resort to administrative judgment." Davis, *supra,* § 19.09 at 53. The only enforcement tool available to the OCR is a cutoff of federal funding to the offending recipient. *See Pushkin,* 658 F.2d at 1381; 29 U.S.C. § 794a(a)(2); 45 C.F.R. § 84 *et seq.* (1980). We recently held that this narrow purse-string discipline does not afford Section 504 plaintiffs an immediate and effective means of vindicating their rights by procurement of necessary educational services. *See Pushkin,* 658 F.2d at 1381. The trial judge did not err in electing to proceed in this action prior to completion of OCR's efforts.

4. That remedy provides in pertinent part:

"3.4 *Appeals from Educational Appraisal and Review Committee Recommendation/Impartial Due Process*

"3.4.1 Procedures shall be adopted by local education agencies for insuring that exceptional children and their parents are guaranteed procedural safeguards in decisions regarding identification, evaluation, and placement of exceptional children.

"3.4.2 In cases of disagreement with the recommendations of the local authorities regarding the evaluation reports and/or program placement recommendations, the opportunity for an impartial hearing must be provided upon written request from the parent(s). LOCAL AUTHORITIES SHOULD PROVIDE EVERY OPPORTUNITY TO EXHAUST INFORMAL AVENUES OF CONCILIATION, but where conciliation is not reached, the school authority shall schedule the hearings in the following manner:

. . . .

m. the findings of the hearing authority with corresponding recommendations shall be reduced to writing and sent, by certified mail, to the parent(s), to the superintendent of the local education agency, and to their legal representatives within twenty (20) days of the conclusion of the hearing. The issues to be decided at such hearings are:

1. Whether there has been a prejudicial departure by the local authorities from the evaluation and placement procedures as prescribed by special education regulations.

2. Whether the local authorities have established, by a preponderance of the evidence presented in concurrence with special education regulations, that sufficient cause existed for its decision.

n. the decision of the hearing authority shall include findings of fact, conclusions, and reasons for these findings and conclusions."

### III.

*Section 504*

Section 504 of the Rehabilitation Act of 1973 forms the core of this lawsuit. It provides:

"No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title [title 29], shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

29 U.S.C. § 794. This statute is not aimed solely at recipients of funds for education; rather, it constitutes an across-the-board requirement of nondiscrimination in all federally assisted programs.

Section 504 was initially silent on the subject of compliance regulations. The Senate Public Welfare Committee subsequently explained that although the statute did "not specifically require the issuance of regulations or expressly provide for enforcement procedure . . . such regulations and enforcement . . . [were] intended." S.Rep.No.1297, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad. News 6373, 6390 (Senate Report). Accordingly, an Executive Order of April 1976 directed the Department of Health, Education and Welfare[5] to adopt Section 504 compliance rules. Regulations were subsequently promulgated pursuant to this order. *See* 34 C.F.R. § 104 *et seq.* (1980) (formerly 45 C.F.R. § 84 *et seq.* (1978)).

Relevant to this action are those regulations directed at handicapped services offered by elementary and secondary public schools. The regulations require operators of such schools to provide "free appropriate public education[s]" to all handicapped students within their territorial jurisdiction. 34 C.F.R. § 104.33(a) (1980); *see also id.* § 104.31. The regulations also compel public schools to develop programs that "meet the individual educational needs of handi-

capped persons as adequately as the needs of nonhandicapped persons are met. . . ." *Id.* § 104.33(b) (1980). Finally, all such programs must conform to administrative identification, evaluation, placement, and procedural rules governing the administration of special education services. *See id.* §§ 104.-34–104.36 (1980). It is against this regulatory backdrop that the State's special education system was examined and found wanting at trial.

The Supreme Court's decision in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), eroded somewhat the breadth of these Section 504 compliance regulations. In *Southeastern Community College*, the Court intimated that the regulations may constitute improper standards for determining Section 504 violations if interpreted too broadly:

"*neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative action obligation* on all recipients of federal funds. Accordingly, we hold that even if HEW has attempted to create such an obligation itself [through the compliance regulations], it lacks the authority to do so.*"

*Id.* at 411–12, 99 S.Ct. at 2369–70 (footnote omitted) (emphasis added). The Court unanimously concluded that the fundamental purpose of Section 504 is to prohibit discrimination against the handicapped rather than mandate affirmative relief for them. *Id.* at 410, 99 S.Ct. at 2369. Although the case was primarily concerned with post-secondary education rights of handicapped students, all of the statute's compliance regulations must be interpreted with the *Southeastern Community College* caveat in mind.

Several opinions subsequent to *Southeastern Community College* appear to construe Section 504's pre-college education compliance regulations to mandate broad affirmative relief. *See, e.g., Tatro v. Texas*, 625 F.2d 557 at 564 (5th Cir. 1980); *Gladys J. v. Pearland Independent School District*, 520

---

5. HEW was recently dissolved. Its former responsibilities are now shared between the De-

partment of Education and the Department of Health and Human Services.

F.Supp. 869, 874–75 (S.D.Tex.1981); *Association For Retarded Citizens v. Frazier*, 517 F.Supp. 105, 122 (D.Colo.1981); *Association of Retarded Citizens v. McDaniel*, 511 F.Supp. 1263, 1281 (N.D.Ga.1981). However, each of these cases simultaneously involved the Education for All Handicapped Children Act of 1975, 20 U.S.C. § 1401 *et seq.* (Handicapped Act) *and* Section 504. The Handicapped Act provides financial assistance to states for the purpose of furnishing educational services to handicapped children. The receipt of this federal money is contingent upon the state's performing certain *affirmative duties* with respect to the education of the handicapped. *See generally Association For Retarded Citizens*, 517 F.Supp. at 108–13 (discussion of Handicapped Act). The cited cases are dissimilar to the instant action because New Mexico has chosen not to participate in the Handicapped Act program. Accordingly, those opinions are of limited value to us inasmuch as their analyses of Section 504 are inextricably interwoven with their construction of the broader Handicapped Act. By contrast, we are concerned in this case only with the antidiscrimination requirements of Section 504.[6]

Nevertheless, *Southeastern Community College* is not fatal to the Association's Section 504 claim. The Court plainly suggests that the distinctions between affirmative action unnecessary under Section 504 and discrimination made unlawful by the section are sometimes unclear. *Id.* 442 U.S. at 412, 99 S.Ct. at 2370. Moreover, *Southeastern Community College* concedes that "situations may arise where a refusal to *modify* an existing program might become discriminatory" under section 504. *Id.* at 412–13, 99 S.Ct. at 2370 (emphasis added).

Close scrutiny of *Southeastern Community College* and other authorities reveals that a federally-funded education system may be found in violation of Section 504 where the entity's practices preclude the handicapped from obtaining system benefits realized by the non-handicapped. Two cases arising under Title VI of the Civil Rights Act of 1964 are illustrative. *See Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Serna v. Portales Municipal Schools*, 499 F.2d 1147 (10th Cir. 1974). These cases are properly analogous to the instant action inasmuch as they involve the education rights of "language handicapped" children, and because Section 504 is "patterned after, and is almost identical to, the antidiscrimination language of . . . the Civil Rights Act of 1964 [Title VI]."[7] Senate Report, *supra.* In *Lau*, the Supreme Court held that non-English speaking students were *discriminated* against by school districts which failed to provide education services that accommodated their language deficiency. *Id.* 414 U.S. at 568, 94 S.Ct. at 789. In *Serna*, this circuit similarly viewed the failure to devise education programs which appropriately provided for the language disadvantaged as unlawful *discrimination* under Title VI. *See* 499 F.2d at 1153. Both cases indicate that *proscribed discrimination occurs when non-English speaking students derive fewer system benefits than their English speaking classmates, even where the education programs serving the students are administered "evenhandedly."* See *Lau*, 414 U.S. at 568, 94 S.Ct. at 789; *Serna* 499 F.2d at 1153–54.

*Southeastern Community College* suggests that refusal to affirmatively modify an education program is not discrimination under Section 504 if the handicapped recipient thereafter would remain unable to ob-

---

6. The State concedes it has elected not to participate in the Handicapped Act's funding program for primary and secondary school-age handicapped children. Brief of Appellants, p. 3–4. Because the constitutional claims initially raised by the Association in connection with this action are not before us, we express no opinion as to whether this election violates the equal protection clause of the 14th Amendment.

7. Title VI of the Civil Rights Act of 1964 provides in pertinent part:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

42 U.S.C. § 2000d.

tain the program's ultimate benefits. 442 U.S. at 409–10, 99 S.Ct. at 2368–69. Conversely, it is reasonable to conclude that refusal to accommodate a handicapped student in an educational program may constitute discrimination if the student could thereby realize and enjoy the program's benefits. *See Tatro*, 625 F.2d at 564 & n.19. However, although Section 504 regulations may sometimes impose a duty to modify federally-funded programs to provide for the handicapped, this duty is not unlimited. Such accommodation is required only when it does not generate undue financial or administrative hardship. *See Southeastern Community College*, 442 U.S. at 412, 99 S.Ct. at 2370; *Majors v. Housing Authority*, 652 F.2d 454, 457 (5th Cir. 1981); *Tatro*, 625 F.2d at 564 n.19. In this regard, it seems apparent under *Lau* and *Southeastern Community College* that the greater the number of children needing the particular special education service, the more likely that failure to provide the service constitutes discrimination. This is so because the more children in need of the service, the more the benefits of that service outweigh its cost.

█ The State argues that demonstrable disparate treatment of handicapped individuals is a prerequisite to finding discrimination under Section 504. Consequently, the State claims the Association was required to show that the special education the State provides to handicapped students is, in and of itself, less adequate than the regular education it provides to nonhandicapped students. The trial court's failure to insist upon such proof, the State maintains, undermines its finding of discrimination.

This court recently ruled that Section 504 infractions are not properly analyzed under a disparate treatment rationale. *Pushkin*, 658 F.2d at 1384–85. And Section 504 plaintiffs need not prove discriminatory intent. *Id.* at 1384. Instead, we concluded that Section 504 and its accompanying regulations form the best basis for evaluating such violations: "§ 504 sets forth its own

criteria for scrutinizing claims under that statute." *Id.* at 1385. *See Southeastern Community College*, 442 U.S. at 403, 99 S.Ct. at 2365 (1979).

Section 504 regulations unambiguously require that elementary and secondary schools receiving federal funds provide handicapped students with appropriate education services suited to their *unique* needs. 34 C.F.R. § 104.33(a), and (b) (1980). *See generally Sherry*, 479 F.Supp. at 1335. These special education programs must serve handicapped students adequately, in the same way that traditional education programs serve nonhandicapped students. 34 C.F.R. § 104.33(b) (1980). In *Lau*, 414 U.S. at 566, 94 S.Ct. at 788, the Supreme Court said:

"[T]here is no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are effectively foreclosed from any meaningful education."

Students who are handicapped, often by speech or hearing impairments or other learning disabilities, are similarly foreclosed from any meaningful education.

We find no language in the statute or regulations suggesting that proof of disparate treatment is essential to establishing a Section 504 infraction in connection with the educational rights of handicapped children. The handicapped by definition demand vastly different learning programs than the nonhandicapped. Accordingly, the State's disparate treatment argument is rejected.

█ Contrary to the State's assertion, there is evidence in the record tending to establish discrimination against handicapped school children. The State is, of course, obligated by both federal and New Mexico law to provide all its pre-college age children with appropriate educations. 34 C.F.R. § 104.33(a) (1980); N.M.Const. art. XII, § 1;[8] N.M.Stat.Ann. § 22–13–5.[9] Un-

---

**8.** N.M.Const. art. XII, § 1 provides:

"A uniform system of free public schools sufficient for the education of, and open to,

all the children of school age in the state shall be established and maintained."

**9.** N.M.Stat.Ann. § 22–13–5 provides:

der Section 504 and its regulations properly interpreted, the State is forbidden from discriminating against the handicapped in meeting this obligation. Trial evidence demonstrates, however, that the state has, *inter alia*: (1) failed to adequately diagnose and identify those handicapped children requiring special education attention and program modification; (2) failed to accommodate and integrate those handicapped children into physical education, vocational counseling, learning and personal guidance programs presently serving their nonhandicapped classmates; and (3) permitted great disparity among the various school districts in their treatment of handicapped students. Such practices arguably violate Section 504.

As we have suggested above, modification of existing programs may be required where the financial burden would not be excessive and the accommodation would enable handicapped children to realize the benefits of the State's educational program. Unfortunately, the trial court failed to address the *Southeastern Community College* guidelines in its opinion and order. Consequently, the judge's findings and conclusions may rest upon an impermissible interpretation of Section 504 or its regulations. In accepting the Association's plan, for example, the court did not analyze its requirements in terms of its costs and its effectiveness.

The decision below is reversed and remanded for further proceedings. Evidence of the State's alleged Section 504 violations must be evaluated by the trial court in light of the Supreme Court's determination that the statute and its regulations are designed to prohibit discrimination rather than require affirmative action. The State's purported failure to properly accommodate handicapped students may still constitute discrimination proscribed under Section 504.

"The state shall require school districts over a five-year period to provide special education sufficient to meet the needs of all exceptional children. Each district shall meet the educational needs of at least one-fifth of its eligible exceptional children during the sixty-first fiscal year, of at least two-fifths of such children during the sixty-second fiscal year, three-fifths during the six-

However, such a conclusion should rest on findings that: (1) the State's existing education programs preclude the handicapped from enjoying program benefits realized by the nonhandicapped; (2) program modification would result in the handicapped obtaining those benefits; and (3) program modification would not jeopardize the overall viability of the State's educational system. The trial judge, of course, has full discretion to receive additional testimony or other appropriate evidence if he determines it to be necessary.

## IV.

### Conclusion

The Supreme Court has emphasized:
"[E]ducation is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities .... It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education."

*Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Section 504's prohibition against discrimination represents a step toward attainment of equality in education for the handicapped. Claims that the statute's guarantees have been violated must be carefully considered.

Reversed and remanded.

ty-third fiscal year, and four-fifths during the sixty-fourth fiscal year. Regulations and standards shall be developed and established by the state board of education for the conduct of special education in the schools and classes of the public school system in the state and in all institutions wholly or partly supported by the state."