Nicholas **HENDRICKS**, et al.

v.

Thomas K. **GILHOOL**, Secretary of Education of the Commonwealth of Pennsylvania.

Civ. A. No. 88–3255.

United States District Court,
E.D. Pennsylvania.

March 23, 1989.

Leonard Rieser, Janet F. Stotland, Philadelphia, Pa., for plaintiffs.

David M. Donaldson, Sr. Deputy Atty. Gen., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

This is an class action seeking declaratory and injunctive relief under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and the Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1400, *et seq.* The defendant is the Secretary of Education of the Commonwealth of Pennsylvania, the official responsible for the administration of the Pennsylvania Department of Education (PDE). Pursuant to the class certification stipulation and order

filed August 22, 1988, the plaintiff class is composed of:

All handicapped children presently in the public education system who have been assigned or referred to special education programs operated by the Carbon–Lehigh Intermediate Unit; and all children who may in the future be so assigned or referred.

Presently pending is plaintiffs' motion for summary judgment.

## I. *Facts*

The evidentiary basis for the plaintiffs' motion is an extensive factual stipulation which was filed by the parties in conjunction with the class certification materials [1]. Rather then set out the stipulation in detail, I adopt these undisputed facts by reference, and summarize the salient facts for purposes of the present motion.

When a handicapped child in Pennsylvania is found to be in need of special education programs that cannot be provided by the district, he or she is referred to the intermediate unit (IU) serving that district. Typically, students referred to IUs are those with relatively severe handicaps, because the specialized services required by these children often cannot readily be provided by the home district. Moreover, districts with only a few children suffering from a particular type of handicap often find it impractical to set up programs for them within the local district.

In assigning children to special education classes, districts and IUs must ensure that each placement provides opportunities for interaction with non-handicapped children to the maximum extent appropriate. Many children served by IU programs are indeed capable of being educated in special classes in regular schools attended by their non-handicapped peers. However, IUs do not own or operate regular schools. Instead, IUs must obtain classroom space from member school districts, or from other sources.

The Carbon–Lehigh Intermediate Unit (CLIU) serves the fourteen school districts of Carbon and Lehigh counties. It operates approximately 95 classes for handicapped students. These classes include 65 single-district classes, which consist of students from one district who typically have mild handicaps, and 30 multi-district classes, which consist of students from various districts who typically have more severe handicaps.

Defendant has candidly admitted to a number of problems with the CLIU program, all stemming from the failure of the school districts of Carbon and Lehigh counties to provide adequate classroom space for handicapped children enrolled in the CLIU program. These problems have been compounded by the recent growth in the population of the area served by the CLIU, which has led member school districts to allocate additional space for non-handicapped students. As a result, for the period from 1982 to the present, the CLIU has not has access to "comparable space" (i.e., space comparable to that provided to non-handicapped students) in regular schools for its handicapped students.

Consequently, as set out in greater detail below, the CLIU (a) has had to place students in facilities that are not comparable to those furnished non-handicapped students, (b) has been required to shift handicapped students from district to district and from school to school, (c) has placed children in facilities that are excessively restrictive and separate from the facilities for non-handicapped children, and (d) has been unable to open new classes needed by handicapped children assigned to it.

### a. Non-comparable Facilities

From 1982 to the present, some CLIU classes have been located in facilities that

---

**1.** The plaintiffs have also filed with the present motion a "Statement of Undisputed Facts," which is drawn in part from the previously filed factual stipulation and the defendant's answer to the complaint. This statement, however, is also purportedly based on various discovery documents, including answers to interrogatories and transcripts of various depositions. These documents have not been submitted by plaintiffs in support of their motion, as provided under Fed.R.Civ.Pro. 56(e). I will therefore treat as "undisputed" only those facts to which the parties have stipulated, or those allegations which the defendant admitted in his answer.

are not comparable to those provided non-handicapped students in terms of size, sanitation, noise levels, furniture, lighting, and ventilation.

b. Relocation of classes

From 1982 to the present, CLIU students—typically children in multi-district classes with more severe handicaps—have been shifted among classroom locations to make classroom space available to non-handicapped children. In some instances, these moves have been to a less central location, i.e., farther from the students' homes. As a result, some handicapped children presently ride a school bus for up to one and three quarter hours in each direction.

c. Restrictive and Separate Facilities

From 1982 to the present, as a result of CLIU's inability to obtain adequate classroom space in regular schools, some CLIU students have been educated in facilities that are separate from and more restrictive than the regular school environment. Such facilities have included separate schools or centers, separate wings or sections of regular schools, and mobile classrooms and trailers.

d. Inability to Open Classrooms

From 1982 to the present, as a result of CLIU's inability to obtain adequate space in regular schools, the CLIU has been unable to open enough special education classes to meet the needs of class members. In some instances, school districts have refused to make space available for classes of children with particular types of handicaps, *e.g.*, students with severe or profound mental retardation or social or emotional disturbances. In several instances, the proposed classes were necessary to ensure that the children received appropriate special education programs.

II. *Discussion*

Summary judgment is appropriate if there exists no genuine issue material fact and the moving party is entitled to judgment as a matter of law. *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). The court does not resolve questions of disputed fact, but simply decides whether there is a genuine issue of fact which must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Ettinger v. Johnson*, 556 F.2d 692 (3d Cir. 1977). The facts must be viewed in the light most favorable to the opposing party, and reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party. *Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 252, 106 S.Ct. at 2512.

a. Statutory and Regulatory Requirements

The two statutes involved in this action, together with their implementing regulations, protect the rights of handicapped children to a free, appropriate, and nondiscriminatory education.

■ Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides in pertinent part:

No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...

Section 504 has been described as "the codification of a guarantee of equal protection for handicapped persons," *Association for Retarded Citizens in Colorado v. Frazier*, 517 F.Supp. 105, 118 (D.Colo.1981),

and as an "across-the-board requirement of nondiscrimination in all federally assisted programs." *New Mexico Association for Retarded Citizens v. New Mexico,* 678 F.2d 847, 852 (10th Cir.1982). Beyond its prohibition of discrimination, however, Section 504 generally does not furnish a basis for affirmative relief to the handicapped. *Southeastern Community College v. Davis,* 442 U.S. 397, 410–11 (1979).

Unlike Section 504, the Education of the Handicapped Act, 20 U.S.C. § 1400, *et seq.,* does impose certain affirmative duties upon recipients of federal funds. In enacting the EHA, Congress sought "to assure that all handicapped children have available to them ... a free appropriate education which emphasizes special education and related services designed to meet their unique needs ..." 20 U.S.C. § 1400(c). This 1975 legislation, which was inspired by Congress' recognition that a distressing proportion of handicapped children suffered from educational neglect, or outright exclusion from public schools, *see* 20 U.S.C. § 1400(c); *Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 596–97, 98 L.Ed.2d 686 (1988), is not a mere funding statute. Rather, it "confers upon disabled students an enforceable substantive right to public education in participating states." *Id.* 108 S.Ct. at 597.

States such as Pennsylvania that receive EHA funding must have in effect a policy that assures that all handicapped children receive a "free appropriate public education," 20 U.S.C. § 1412(1), which is statutorily defined as:

> special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(18); *see Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 172–73 (3d Cir.1988), *cert. denied*

*sub nom., Central Columbia School v. Polk,* —— U.S. ——, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989). Participating states must develop a formal plan for the education of the handicapped with a detailed timetable for reaching the goal of providing full educational opportunities to disabled children, 20 U.S.C. §§ 1412(2) and (3); must develop procedures to assure that handicapped children are educated with non-handicapped children to the maximum extent feasible, 20 U.S.C. § 1412(5); and must assure that educational programs for the handicapped meet the standards of the state's educational agency. 20 U.S.C. § 1412(6). These affirmative obligations are designed "to ensure that equal access to a public education is not an empty guarantee, but offers some benefit to a handicapped child." *Smith v. Robinson,* 468 U.S. 992, 1018–19, 104 S.Ct. 3457, 3472, 82 L.Ed.2d 746 (1984).

The specific nature of the educational services required under the EHA and § 504 has been the subject of extensive litigation, which is perhaps a reflection of the reality that a guarantee of equal and "appropriate" treatment of the handicapped must take into account the unique and special needs of these individuals. However, it is undisputed that both Acts prohibit funding recipients from furnishing to handicapped individuals facilities and services that are objectively *inferior* to those provided their non-handicapped peers. The prohibition of discrimination against the handicapped is explicit in Section 504, and is a pervasive theme in the caselaw and regulations implementing both Section 504 and the EHA. *See, e.g., Battle v. Commonwealth of Pennsylvania,* 629 F.2d 269, 279 (3d Cir. 1980) (citing the EHA's goal of assuring equal protection for handicapped students); *New Mexico Association for Retarded Citizens, supra,* 678 F.2d at 853 ("[A] federally funded education system may be found in violation of Section 504 where the entity's practices preclude the handicapped from obtaining system benefits realized by the non-handicapped."); *Students of California School for the Blind v. Honig,* 736 F.2d 538 (9th Cir.1984), *vacated as moot,* 471 U.S. 148, 105 S.Ct. 1820, 85 L.Ed.2d 114

(1985) (EHA and Section 504 require state to satisfy its own safety standards by conducting seismic testing at school for the blind); 34 C.F.R. § 104.4(b) (Section 504 regulations broadly prohibiting federal funding recipient from discriminating against handicapped persons) [2]; 34 C.F.R. § 104.33(b)(1)(i) (Section 504 requires federally funded schools to meet the individual educational needs of the handicapped as adequately "as the needs of nonhandicapped persons are met").

b.  Exhaustion of Administrative Remedies

■  The parties have agreed that the plaintiffs are not required to exhaust their administrative remedies under the EHA, which is typically a requirement for relief under both the EHA and § 504 [3]. Complaint, ¶ 74; Answer, ¶ 74. Because there is no adequate administrative remedy for the plaintiffs' systemwide challenge to the provision of classroom space to CLIU students, I also conclude that exhaustion would be futile in this case. Thus, the exhaustion requirement may be excused. *See Honig v. Doe, supra* 108 S.Ct. at 606 (EHA exhaustion requirement may be bypassed "where exhaustion would be futile or inadequate."); *Tokarcik v. Forest Hill School District,* 665 F.2d 443, 447 n. 5 (3d Cir.1981), *cert. denied sub nom. Scanlon v. Tokarcik,* 458 U.S. 1121, 102 S.Ct. 3508, 73 L.Ed.2d 1383 (1982) (same); *New Mexico Association for Retarded Citizens, supra* (Exhaustion not required for systemwide challenge to state special education program).

c.  Necessary Parties under Rule 19

■  Defendant argues that plaintiffs' motion should be denied pursuant to Fed.R. Civ.Pro. 19(a) for failure to join necessary parties, namely, the Carbon–Lehigh Intermediate Unit and its constituent school districts. Defendant contends that joinder of these parties is necessary, as they are directly affected by this litigation, and their presence is essential in shaping relief.

A similar argument was made, and rejected, in a class action brought under § 504 and the EHA challenging the failure of local educational agencies to provide handicapped children with an individualized educational program. *Association for Retarded Citizens in Colorado, supra.* The plaintiffs named as defendants in that action the Colorado Department of Education and its commissioner. The court found that the local school boards and the Colorado Department of Institutions, the operator of the state home and training school that was a subject of the litigation, were not indispensable parties under Rule 19. The court explained:

Although these and other public agencies have an interest in the outcome of the litigation, I find that their joinder is not necessary. The state department of education is the appropriate party to be named and such is consistent with the intent of congress in requiring under [the EHA] that one state entity, and one only, be ultimately responsible for educational services to handicapped children once the state receives federal funds. [The EHA] requires that each participating state designate one single agency which will be responsible for "assuring that the re-

---

2.  Of particular relevance are the regulations that prohibit a funding recipient from selecting facilities for the handicapped:

(i) that have the effect of excluding handicapped persons from, denying them the benefits of, or otherwise subjecting them to discrimination under any program ... that receives ... Federal financial assistance or

(ii) that have the purpose or effect of substantially impairing the accomplishment of the objectives of the program ... with respect to handicapped persons.

34 C.F.R. § 104.4(5).

3.  Handicapped Children's Protection Act of 1986, Pub.L. No. 99–372 (1986), 20 U.S.C. § 1415(f). In *Board of Education of East Windsor Regional School v. Diamond,* 808 F.2d 987, 994–95 (3d Cir.1986), the Third Circuit found that in enacting P.L. 99–372, Congress "explicitly adopted" the reconciliation of EHA and § 504 advanced by the dissenters in *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), which permits claims for free appropriate education under both EHA and § 504 to be filed after exhaustion of EHA administrative remedies.

quirements of [the Act] are carried out ...." 20 U.S.C. § 1412(6) ...

. . . . .

Regarding the section 504 and equal protection claims plaintiffs have chosen to name only the state department and commissioner in this action. The state is a recipient under section 504 and is therefore prohibited from discriminating on the basis of handicap, whether directly or through subrecipients. *See* 45 C.F.R. §§ 84.3(f) and 84.4. The state department is an appropriate subject for suit in an action under section 504 or the equal protection clause. In its state plan the defendants assure compliance with section 504 and its implementing regulations. Therefore, I see no need for the joinder of further parties. In making this determination I agree with plaintiffs that the wisdom of the single agency responsibility provision is crystallized by this case. The joinder of all involved local educational agencies within the state and the Department of Institutions, along with any other tangentially related public agencies, could transform a trial on the merits to a finger pointing contest among defendants regarding with whom the responsibility for educating handicapped children lies.

517 F.Supp. at 123–24; *see also Hoots v. Commonwealth of Pennsylvania,* 359 F.Supp. 807, 821–22 (W.D.Pa.1973), *cert. denied,* 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed. 2d 124 (1974) (local school districts not necessary parties in action challenging district boundaries, as state had power to establish boundaries). I agree with Judge Kane's analysis on this issue. The defendant is the administrator of the commonwealth's Department of Education, the "state educational agency ... responsible for assuring that the requirements of [the EHA] are carried out." 20 U.S.C. § 1412(6); *see also* 20 U.S.C. § 1401(7); *Battle, supra* 629 F.2d at 278 (EHA "clearly places ultimate responsibility for compliance with the Act upon the state educational agency"). His department is also responsible for assuring that "all educational programs for handicapped children within the state, *including*

*all such programs administered by any other State or local agency,* will be under the general supervision of the persons responsible for educational programs for handicapped children in the State educational agency and shall meet education standards of the State educational agency." 20 U.S.C. § 1412(6) (emphasis added). Furthermore, under both the EHA and Section 504, the defendant is authorized to invoke appropriate sanctions to ensure compliance with the statutes. *See* 20 U.S.C. § 1414(d) (state educational agency authorized to withhold EHA payments from non-complying local agency and provide special education services directly to handicapped children); 34 C.F.R. § 300.575 (state educational agency to develop "plans and procedures, including sanctions" to ensure EHA compliance) 34 C.F.R. § 104.4(b)(1)(v) (federal funding recipient may not provide assistance to agencies that violate Section 504).

In *Kruelle v. New Castle School District,* 642 F.2d 687 (3d Cir.1981), the Third Circuit held that the district court did not err in assigning responsibility to the Delaware State Board of Education for the evaluation of plaintiff's educational needs and the implementation of an appropriate individualized education program. The court found that "[b]oth a general, congressional perception of the state's primary responsibility to provide education for all children and a specific intent to centralize" responsibility for EHA compliance underlie the "explicit statutory mandate" of § 1412(6). 642 F.2d at 696. The court added that "[b]y placing the burden of coordinating efforts and financial arrangements for [the child's] education on the State Board of Education, the trial judge was both reflecting legislative intent and appropriately observing the limits of his institutional role." *Id.* at 697.

In addition to the federal provisions making defendant accountable for EHA compliance, state law assigns to defendant's department the ultimate responsibility for oversight of the commonwealth's public education system, 71 P.S. § 352, including the education of handicapped children in local school districts and intermediate units, 24 P.S. §§ 13–1372(2) and (3). Defendant is

thus properly chargeable for the violations of the EHA alleged by plaintiffs, and has the power to remedy the alleged violations through the exercise of his statutory authority. For these reasons, I find that the Carbon–Lehigh Intermediate Unit and the local school districts are not necessary parties under Rule 19, and I shall not require their joinder[4].

### d. Statutory Violations

■ 1. *Non-comparable classrooms:* The defendant concedes that because of the failure of local school districts to furnish adequate classroom space for CLIU classes, handicapped children served by the intermediate unit have not had access to "comparable" facilities, i.e., "space that is comparable in quality to that provided to non-handicapped students." Stipulation, ¶ 20. I do not believe that the EHA and § 504 require that the classroom space afforded CLIU students be precisely equivalent to that afforded non-handicapped students. Such a standard would impose a nearly impossible burden on school administrators charged with allocating classroom space to special education programs. However, the thirteen examples of non-comparable facilities described in the factual stipulation do not represent trivial or insignificant disparities. The CLIU classrooms noted in the stipulation are unequal to those furnished non-handicapped students in several important areas including size, sanitation, ventilation, noise level, and furnishings. Stipulation, ¶ 31[5]. Because of the significance of these disparities, I hold that the defendant has violated the plaintiffs' statutory rights by failing to ensure that plaintiffs' educational facilities are comparable to those enjoyed by non-handicapped students.

■ 2. *Disruptive Relocation of Classes:* The inability of the CLIU to obtain adequate classroom facilities has also resulted in the relocation of several CLIU classes, which have been shuffled between schools, and on some occasions to schools in other districts, in order to make classroom space available for non-handicapped students. As a result of these relocations, some handicapped students have been assigned to schools at a considerable distance from their homes, requiring them to ride a bus up to one and three quarter hours in each direction in order to attend school. Stipulation, ¶¶ 22–25[6].

The extent of the relocation problem on a systemwide basis is not evident from the stipulated facts. Considering the size of the CLIU program, I may reasonably assume that some classroom relocations were necessitated by legitimate programmatic and logistical concerns of the CLIU and the involved school districts. However, the defendant concedes that classes have been

---

4. I note also that despite defendant's expressed concern that the Carbon–Lehigh Intermediate Unit and the local school districts are necessary parties to this action, he has not sought to implead these parties pursuant to Fed.R.Civ.Pro. 14(a), and these parties have not sought to intervene in this action pursuant to Fed.R.Civ.Pro. 24. However, I do not exclude the possibility that the CLIU and the affected school districts may have to be joined at some later stage of the proceedings, if their presence in this action is necessary to ensure compliance with the court's remedial orders. *See Hoots, supra,* 359 F.Supp. at 822.

5. I note also that many of the non-comparable features of these classrooms violate the defendant's own criteria for "appropriate facilities" for special education classrooms. *See* Fair Share Criteria for Appropriate Facilities, Exh. A to Defendant's Memo at 2.

6. The experiences of the named plaintiffs are perhaps representative of classmembers who have experienced classroom relocations. Bryan Tiscio, a ten year old mentally retarded child, originally attended IU classes in his home district, the Jim Thorpe Area School District. In 1985–87, he was assigned to a multi-district class in the Weatherly School District. In 1987–88, his class was shifted to the Jim Thorpe district to make space available for non-handicapped students. As of the filing of the stipulation, it appeared that his class would again be moved to the Palmerton School District for 1988–89 in order to accommodate non-handicapped children.

Nicholas Hendricks, who suffers from autism, was assigned to a multi-district class in the Steckel Elementary School in the Whitehall–Coplay School District from 1986–88. For 1988–89, his class was relocated the Gockley Elementary School, also in that district, in order to make space available for non-handicapped children. Stipulation ¶¶ 34–41.

relocated on occasion to make room for non-handicapped children. Given the disruption of the educational programs of CLIU students that is inherent in such relocations, and the inequity of forcing handicapped youngsters to travel extended distances in order to attend their relocated classes [7], I do not consider the accommodation of non-handicapped students to be a sufficient reason to justify these moves. Accordingly, I hold that inter-school or inter-district CLIU classroom relocations resulting from a failure of the school districts to provide adequate space for CLIU classes constitutes a violation of the defendant's statutory duty to ensure that handicapped students do not suffer discrimination in the provision of educational facilities [8].

■ 3. *Restrictive Classroom Settings:* A further result of the CLIU's inability to obtain adequate classroom space in regular schools is that CLIU students "have been educated in facilities that are separate from and more restrictive than the regular school environment," including "separate schools or centers; separate wings or sections of regular schools; and mobile classes or trailers." Stipulation ¶ 32.[9]

Under 20 U.S.C. § 1412(5), any state receiving EHA funding must adopt

procedures to assure that, to the maximum extent appropriate, handicapped children ... are educated with children who are not handicapped, and that separate classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature and severity of the handicap is such that education in regular classrooms with the use of supplementary aids and services cannot be achieved satisfactorily.

*See also, Honig v. Doe, supra,* 108 S.Ct. at 597; *Garrick B. v. Curwensville Area School District,* 669 F.Supp. 705, 710–11 (M.D.Pa.1987) (EHA permits placement in a private school only if less restrictive alternatives not available); 34 C.F.R. §§ 300.-550–300.552 (implementing regulations). *Roncker on behalf of Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir.1983) ("The perception that a segregated institution is academically superior for a handicapped

---

**7.** The EHA regulations provide:

Each public agency shall insure that:
(a) Each handicapped child's educational placement: ...
(3) Is as close as possible to the child's home. 34 C.F.R. § 300.552. The plaintiffs seek an order prohibiting the assignment of CLIU students to a facility located at a travelling distance of more than one hour from the students' home. The present record does not furnish a sufficient basis for imposing such a blanket requirement, particularly in light of the fact that classes for severely handicapped children are sometimes made up of students from several school districts. Stipulation ¶ 15. However, to the extent that disabled students must travel extended distances to school solely because of the school districts' refusal to make classroom space available to the CLIU, *see* Stipulation ¶ 25, the assignment of CLIU classrooms is discriminatory, and thus in violation of Section 504 and the EHA.

**8.** I cannot conclude on the basis of the present record that the relocation of CLIU classes to other classrooms *within* a particular school would be so disruptive as to constitute impermissibly disparate treatment of plaintiff classmembers. Of course handicapped students may not be relocated to classroom space that is not comparable to that provided non-handicapped students.

**9.** Examples of the restrictive and separate CLIU facilities include the following:

a. Some CLIU students have been assigned to private schools at public expense because the CLIU was unable to obtain suitable classroom space for them in regular schools.
b. In 1987–88, a high school class for emotionally disturbed students was housed in a portable classroom in the Catasauqua School District, separated from the rest of the school building.
c. Handicapped students are currently the only children taught in the basement of the Jim Thorpe Junior High School.
d. Two Fall, 1987 classes in the Panther Valley School District were housed in trailers set apart from the elementary school building.
e. In 1983, classes for socially and emotionally disturbed students were assigned to the Carbon County High School, a separate facility serving only handicapped children, solely because the local school districts had made no space available in regular schools.
f. In 1983, classes for physically handicapped and retarded children were assigned to the Bevan School, a separate facility serving only handicapped children, solely because the local school districts had made no space available in regular schools.
Stipulation ¶ 33.

child may reflect no more than a basic disagreement with the mainstreaming concept. Such a disagreement is not, of course, any basis for not following the Act's mandate.") [10]

Despite the statutory preference for mainstreaming, 20 U.S.C. § 1412(5) also evidences Congress' recognition "that regular classrooms simply would not be a suitable setting for the education of many handicapped children ... The Act thus provides for the education of some handicapped children in separate classes or institutional settings." *Hendrick Hudson District Board of Education v. Rowley*, 458 U.S. 176, 181 n. 4, 102 S.Ct. 3034, 3038 n. 4, 73 L.Ed.2d 690 (1982).

Although the defendant does not press this point, I may safely assume that in the case of children with particularly severe mental, emotional, or physical handicaps, education in separate facilities, or separate sections of regular schools, may not only be warranted by logistical exigencies, but may be required for the students' appropriate education. *See Board of Education of East Windsor Regional School v. Diamond*, 808 F.2d 987, 992 (3d Cir.1986) (residential placement may constitute "least restrictive" educational environment). However, the defendant has conceded that many CLIU children "are capable of being educated in special classes located in regular schools attended by their non-handicapped peers." Stipulation ¶ 9. In the case of such children, the mainstreaming objective of the EHA is thwarted if dis-abled youngsters are shunted off to separate facilities, or unnecessarily segregated in isolated classrooms in regular schools, solely because the local school districts refuse to provide adequate classroom space for CLIU students. I thus hold that this practice is a violation of the defendant's duty to assure that handicapped children are educated in the "regular educational environment" to the maximum extent appropriate to the needs of the handicapped children. 20 U.S.C. § 1412(5); 34 C.F.R. § 104.34(a). My holding is of course limited to those CLIU students who are capable of being educated in regular schools.

■ 4. *Failure to Open Necessary Classes:* The most distressing admissions by defendant are those relating to the CLIU's inability, because of inadequate classroom space, to open enough special education classes to meet the needs of class members [11]. The defendant concedes that in at least four recent instances, proposed classes which were needed to ensure the appropriate special education of handicapped children were not opened because no district would provide classroom space. *Id.* at ¶¶ 28–29. I have little difficulty in holding that the failure to open classes necessary for the appropriate special education of class members runs afoul of the commonwealth's duty under the EHA and the implementing regulations of § 504 to assure that handicapped children receive "a free appropriate education." 20 U.S.C. § 1412(1); 34 C.F.R. §§ 104.33 and 104.34; *Association of Retarded Citizens, supra,*

---

**10.** The Section 504 regulations also require that handicapped children be educated with non-handicapped children "to the maximum extent appropriate to the needs of the handicapped children." 34 C.F.R. § 104.34.

**11.** Paragraph 28 of the Stipulation states several instances in which the CLIU has been unable to open classes required by handicapped children because of the school districts' failure to provide adequate space. These necessary classes include:

(a) A junior high school class for socially and emotionally disturbed children in Lehigh County, needed for the 1987–88 school year.
(b) An elementary class in Lehigh County for socially and emotionally disturbed children, needed for the 1987–88 school year, which was not opened until Spring, 1988.

(c) A high school class for socially and emotionally disturbed students in Carbon County.
(d) A second elementary classroom for children with severe and profound mental retardation, needed in Carbon County for 1987–88, which was not opened because no district would provide space. Instead, the children who would have been assigned to this class were required to share a single classroom in the Jim Thorpe School District with another special education class.

Moreover, in some unspecified instances, "school districts have refused to make space available for classes of children with certain types of handicaps, *e.g.,* students with severe or profound mental retardation or social and emotional disturbances." *Id.* at ¶ 27.

517 F.Supp. at 123 ("A failure to provide an individualized education to handicapped children with their specialized needs would be tantamount to depriving them of an equal opportunity to education and would be a clear violation of Section 504.") Whatever may be the limits of the states' statutory duty to educate its handicapped citizens, it surely extends to the provision of special education classes necessary for the education of disabled children. *See Rowley, supra,* 458 U.S. at 201, 102 S.Ct. at 3048 ("[T]he 'basic floor of opportunity' provided by the [EHA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.")

Despite these acknowledged inadequacies in the provision of classroom facilities to CLIU students, the defendant argues that he has fulfilled his responsibility to ensure the appropriate, non-discriminatory education of handicapped children in Carbon and Lehigh county. The defendant also argues that this case is now moot, or at least not subject to summary judgment.

■ The basis of the defendant's contentions is a "Fair Share Plan" which was recently formulated by the PDE to ensure the provision of comparable facilities to handicapped students. The PDE is presently soliciting "three-year facilities plans" from school districts and intermediate units, which are to "provide for sufficient appropriate classroom space for all exceptional students educated within the ... intermediate unit/school district." This plan shall provide for "appropriate space," as defined in the "Fair Share Criteria for Appropriate Facilities." The fair share criteria mandate that space for handicapped students "be comparable in quality to that provided to non-handicapped students," in several important areas such as location, instructional appropriateness, accessibility, size, lighting, and ventilation. The facilities plan also provides standards for the relocation of classes for handicapped stu-

dents. The plan must also provide for the identification of classes currently located in non-appropriate space, and for the relocation of such classes, on a three year schedule, to appropriate space [12].

According to the verifying affidavit from Charles Wall, the Special Assistant to the defendant, this plan "has been sent to the Carbon–Lehigh Intermediate Unit and its constituent school districts to address the lack of provision of adequate classroom space for handicapped students." The objective of this plan "is to make certain that by the [F]all, 1989, handicapped students in the Carbon–Lehigh Intermediate Unit will begin to have their fair share of adequate classroom space."

The defendant's promulgation of a "Fair Share Plan" does not moot this action, nor does it prevent entry of summary judgment for plaintiffs.

An action is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). As a general rule, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.,* does not make the case moot." *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The burden of demonstrating mootness is a heavy one, *Id.* at 632–33, and is met only if:

(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and,

(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

*County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (citations omitted); *see also Honig v. Doe, supra,* 108 S.Ct. at 601 (EHA action not moot "if there is reasonable likelihood that respondents will again suffer the deprivation of EHA-mandated rights" giving rise to the litigation.) In

12. The plan must provide that by September, 1989, 20% of classes in non-appropriate space must be relocated; by September, 1990, 60% of such classes must be relocated; and by September, 1991, all such classes will be relocated.

this case, the statutory violations are systemwide and continuing. Indeed, the affidavit submitted with the "Fair Share Plan" explicitly acknowledges the present lack of adequate classroom space for handicapped students. Under these circumstances, the defendant's submission of a written plan purporting to cure the ongoing statutory violations falls far short of the showing required to demonstrate mootness.

The plan also does not discharge defendant's statutory responsibility to ensure the appropriate, non-discriminatory education of handicapped children in Carbon and Lehigh Counties, and thus summary judgment regarding defendant's statutory violations is still appropriate. Although the fair share plan represents a commendable effort by the defendant to remedy the disparate treatment of handicapped children in Carbon and Lehigh Counties, its provisions do not address all of the statutory violations noted herein. In particular, the plan does specifically or completely remedy the CLIU's inability to open necessary special education classes, or the location of CLIU classes in separate facilities. Moreover, leaving aside potential shortcomings of the fair share plan in the context of this action, the fact remains that the mere solicitation by the defendant of a facilities plan from the CLIU and the school districts does not ensure that the present statutory violations will be remedied adequately or expeditiously.

For the foregoing reasons, and on the basis of the undisputed facts in this action, I will grant the plaintiff's motion for summary judgment on Counts I, II, and III of the Complaint, to the extent that it seeks a declaration that defendant has violated the rights of plaintiff classmembers under the Rehabilitation Act and the Education of the Handicapped Act. I find that the defendant has violated these statutes by failing to ensure:

(a) that CLIU students are provided with adequate classroom space comparable to that provided non-handicapped children;

(b) that special education classes that are necessary for the appropriate education of classmembers are made available;

(c) that CLIU students are not, because of the failure of school districts to provide adequate, comparable classroom space, segregated in separate facilities, or in isolated classrooms in regular schools;

(d) that CLIU classes are not, because of the failure of school districts to provide adequate, comparable classroom space, relocated to a site in another school or another district.

In view of the seriousness and the long-standing and systematic nature of the above cited violations, I conclude that the plaintiffs have satisfied the criteria for the entry of a permanent injunction to remedy these violations. However, I shall not at this point enter order specific injunctive relief. Rather, mindful that "hard decisions of resource allocation ... are best left to the state, in the first instance," *Battle, supra,* 629 F.2d at 278, I shall direct the defendant to submit a plan, to be entered as a remedial order, which shall ensure that the above-described violations are remedied expeditiously. As I shall give the plaintiffs an opportunity to respond to the plan and submit proposed modifications, I encourage defendant to work with plaintiffs' counsel in shaping the plan.

As noted, the defendant has begun to address the statutory violations in his "Fair Share" plan, which may well serve as a foundation for the court's remedial order [13]. I will not comment definitively at this point on the specific provisions of that plan. However, in the context of this case, the three year period of the plan, coupled with the relatively small proportion of inappropriate classroom assignments that are remedied in the first year of the plan, give me some cause for concern.

I recognize that the institutional changes required to remedy the statutory violations described herein cannot happen overnight. Educational programs for handicapped children compete for space and money with programs for non-handicapped students.

13. I of course do not intend for any remedial order entered in this action to relieve the CLIU or the involved school districts of any additional duties under the Fair Share Plan.

However, it is evident from the defendant's own admissions that the children served by the Carbon–Lehigh Intermediate Unit have for too long been the losers in this competition. It is said that the greatness of a society is ultimately measured not by its riches or might, but by how it treats its most unfortunate members. The statutes at issue here embody our nation's commitment to eliminate the longstanding discrimination endured by Americans with physical or mental handicaps. Although this court cannot guarantee that the disabled children of Carbon and Lehigh counties will enjoy untroubled lives, or even that their education will enable them to achieve their full potential, it can and will ensure that the clear commands of these statutes are promptly enforced.

An appropriate order is attached.

### ORDER

Upon consideration of the plaintiffs' Motion for Summary Judgment, the defendant's response thereto, and the parties' memoranda, and for the reasons stated in the attached memorandum, it is ORDERED that:

1. The plaintiffs' motion for declaratory judgment on liability under Counts I, II, and III of the Complaint is GRANTED. Judgment on liability under Counts I, II, and III is ENTERED in favor of plaintiffs and against defendant.

2. Defendant shall file and serve a proposed remedial order within 30 (thirty) days of the date of entry of this order by the clerk's office. Plaintiffs shall respond to the proposed remedial order within ten (10) days of service.

IT IS SO ORDERED.